JOHN B. McNAMARA, D/B/A McNAMARA JEWELERS, PLAINTIFF/APPELLEE V.
WILMINGTON MALL REALTY CORP., DEFENDANT/APPELLANT

No. COA95-176

(Filed 6 February 1996)

1. **Landlord and Tenant § 13 (NCI4th)— lease of mall space— constructive eviction—breach of covenant of quiet enjoyment—sufficiency of evidence**

    The trial court did not err in denying defendant's motions for directed verdict and JNOV on plaintiff's constructive eviction claim and claim for breach of covenant of quiet enjoyment where the evidence tended to show that plaintiff leased mall space from defendant for the purpose of operating a jewelry store; about six months after the jewelry store opened, an aerobics studio opened next door; plaintiff immediately began to complain about the noise; although defendant made efforts to remedy the situation and informed plaintiff in May 1992 that it considered the matter closed, plaintiff continued to lodge complaints with defendant's leasing agent into the fall of 1992 in an effort to resolve the situation; in mid-October plaintiff called a security officer to abate the noise; six weeks later plaintiff abandoned the property; and the jury thus could find that plaintiff abandoned the premises within a reasonable time and that the abandonment was the result of defendant's failure to remedy the noise from the studio.

    **Am Jur 2d, Covenants, Conditions, and Restrictions §§ 71, 94, 96, 115; Landlord and Tenant § 734.**

    **Breach of covenant for quiet enjoyment in lease. 41 ALR2d 1414.**

    **Modern status of rules as to existence of implied warranty of habitability or fitness for use of leased premises. 40 ALR3d 646.**

    **Implied warranty of fitness or suitability in commercial leases—modern status. 76 ALR4th 928.**

2. **Landlord and Tenant § 13 (NCI4th)— breach of lease agreement—failure to pay rent—no bar to action for breach**

    There was no merit to defendant's contention that, even if its actions did amount to a constructive eviction or a breach of the

McNAMARA v. WILMINGTON MALL REALTY CORP.

[121 N.C. App. 400 (1996)]

covenant of quiet enjoyment, plaintiff's failure to pay rent amounted to a waiver of his right to assert such claims, since defendant took no action regarding plaintiff's complaints after April or May 1992; for the purposes of plaintiff's claims, defendant's failure to abate the noise constituted a constructive eviction as of that time; plaintiff had a reasonable time within which to abandon the premises, which he did; and plaintiff's failure to pay rent in the intervening period was not a bar to his breach of contract claims, notwithstanding the language in the parties' lease which defendant alleged expressly conditioned plaintiff's right to quiet enjoyment upon his payment of the rent.

**Am Jur 2d, Landlord and Tenant §§ 729, 804.**

**Landlord's duty, on tenant's failure to occupy, or abandonment of, premises, to mitigate damages by accepting or procuring another tenant. 21 ALR3d 534.**

**Constructive eviction by another tenant's conduct. 1 ALR4th 849.**

**Implied warranty of fitness or suitability in commercial leases—modern status. 76 ALR4th 928.**

3. **Landlord and Tenant § 27 (NCI4th)— breach of contract— lost profits—failure to meet burden of proof**

In an action for breach of contract based upon the theories of constructive eviction and breach of the covenant of quiet enjoyment, plaintiff failed to meet his burden of proving lost profits with reasonable certainty where plaintiff did not have an established history of profits; his evidence of lost profits consisted entirely of the testimony of a professor at UNC-Wilmington who was a specialist in "entrepreneurship"; the witness based his estimate of lost profits on the assumption that during the remaining term of the lease plaintiff's sales would have risen in a linear fashion to the point where they matched the average sales of independent national jewelers; the witness made virtually no effort to obtain sales figures and other financial data from small custom jewelry stores like plaintiff's or from other jewelers in the Wilmington area; the witness's reliance on data from independent national jewelers without ascertaining whether these jewelers bore any similarities to plaintiff's business rendered his calculations too conjectural to support an award of lost profits; plaintiff owner's lack of business experience could be a relevant factor in

McNAMARA v. WILMINGTON MALL REALTY CORP.

[121 N.C. App. 400 (1996)]

assessing the future profitability of his new business, a factor which the witness failed to consider; and thus the witness's calculations were not based upon standards which allowed the jury to determine the amount of plaintiff's lost profits with reasonable certainty.

**Am Jur 2d, Damages §§ 902, 913, 939, 962-964.**

**Recovery of anticipated lost profits of new business. 55 ALR4th 507.**

**4. Evidence and Witnesses §§ 1994, 2010 (NCI4th)— evidence of prior lease negotiations—inadmissibility to prove breach of lease—admissibility to prove fraud and unfair and deceptive trade practices**

Though evidence of prior lease negotiations was not admissible to prove breach of the lease, since terms such as "shopping center" and "mall" in the lease agreement did not create an ambiguity and the parol evidence rule therefore prevented evidence of prior negotiations from coming in to contradict the terms of the lease, such evidence was admissible to prove fraud and unfair and deceptive trade practices.

**Am Jur 2d, Fraud and Deceit §§ 451-453.**

**Coverage of leases under state consumer protection statutes. 89 ALR4th 854.**

Appeal by defendant from judgment entered 27 July 1994 by Judge W. Allen Cobb, Jr. in New Hanover County Superior Court. Heard in the Court of Appeals 14 November 1995.

*Shipman & Lea, by Gary K. Shipman, for plaintiff-appellee.*

*Murchison, Taylor, Kendrick, Gibson & Davenport, L.L.P., by Michael Murchison, for defendant-appellant.*

WALKER, Judge.

In late spring 1991, plaintiff John B. McNamara became interested in leasing space at Long Leaf Mall (the Mall) to house a retail custom jewelry store. The Mall was at all relevant times owned by defendant Wilmington Mall Realty Corp. and managed by Great Atlantic Real Estate-Property Management (Great Atlantic). Plaintiff approached Newby Toms (Toms), a leasing agent for Great Atlantic, and brief

McNAMARA v. WILMINGTON MALL REALTY CORP.

[121 N.C. App. 400 (1996)]

negotiations followed. As a result of these negotiations, plaintiff and defendant, through Great Atlantic, executed a five-year lease for store space 26 in the Mall. Thereafter, plaintiff renovated the store space at his own expense and commenced operations in August 1991.

In January or February 1992, Toms informed plaintiff that he was proposing to locate an aerobics studio in the space adjacent to plaintiff's store. Toms informed plaintiff that under the terms of the lease with the aerobics studio, the studio was required to do soundproofing and could be relocated if necessary. On 17 February 1992, the studio commenced operating.

Plaintiff immediately began objecting to Toms that the music coming from the aerobics studio was too loud and could be heard in his store. He also complained to Nancy Arnoux, the owner of the studio. By letter dated 26 February 1992, plaintiff notified defendant that he was dissatisfied with defendant's lack of efforts to remedy the situation and demanded a resolution of the matter within seven (7) days of defendant's receipt of the letter. After receiving no response, plaintiff contacted an attorney, who notified Great Atlantic by letter dated 12 March 1992 that plaintiff would be depositing his current rental payment into an escrow account until the nuisance was abated. In response, Toms directed the studio to install insulation as required by the terms of the studio's lease. The insulation was promptly installed, but plaintiff continued to complain that the noise from the studio was disrupting his business. Great Atlantic informed plaintiff by letter dated 31 March 1992 that remedial action had been completed and it considered the matter closed. Great Atlantic demanded payment of the March and April rent within five (5) days of plaintiff's receipt of the letter. By letter dated 9 April 1992, plaintiff's attorney notified Great Atlantic that plaintiff disagreed that the matter was resolved. He stated that plaintiff would pay Toms his customary April rent but would continue to hold the March rent in escrow until the matter was resolved. In late April or early May, Great Atlantic agreed to pump insulation into the wall space between plaintiff's store and the aerobics studio. After this was done, Great Atlantic told plaintiff it considered the matter closed and demanded that plaintiff begin paying rent. Plaintiff paid no rent after April 1992, and on 24 December 1992, plaintiff abandoned his space in the Mall.

On 29 September 1992, plaintiff sued defendant for breach of contract based upon the theories of constructive eviction and breach of the covenant of quiet enjoyment. Defendant counterclaimed for past

due rent. Plaintiff later amended his complaint to allege damages for fraud, negligent misrepresentation, and unfair and deceptive trade practices.

At trial, after the close of all the evidence, the trial court granted defendant's motion to dismiss the fraud, negligent misrepresentation, and unfair and deceptive trade practices claims. The jury thereafter returned a verdict for plaintiff in the amount of $110,000 on the breach of contract claim. The trial court denied defendant's motions for judgment notwithstanding the verdict (JNOV), new trial, remittitur, and amendment of the judgment.

## I.

We first address defendant's argument that the trial court erred in denying its motions for directed verdict and JNOV on plaintiff's breach of contract claim. Specifically, defendant argues that the evidence was insufficient as a matter of law to support plaintiff's constructive eviction claim.

A motion for directed verdict tests the legal sufficiency of the evidence to take the case to the jury and support a verdict for the nonmovant. *Manganello v. Permastone, Inc.*, 291 N.C. 666, 670, 231 S.E.2d 678, 680 (1977). In ruling on a defendant's motion for directed verdict, the evidence must be viewed in the light most favorable to the plaintiff. *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988). All conflicts in the evidence must be resolved in the plaintiff's favor, and he must be given the benefit of every reasonable inference that can be drawn in his favor. *Id.* Only where the evidence is insufficient to support a verdict in the plaintiff's favor should the defendant's motion be granted. *West v. Slick*, 313 N.C. 33, 40, 326 S.E.2d 601, 606 (1985). If there is a scintilla of evidence supporting the plaintiff's *prima facie* case, then the motion should be denied. *Burris v. Shoemate*, 77 N.C. App. 209, 211, 334 S.E.2d 514, 515-16 (1985). A motion for JNOV is essentially the renewal of a prior motion for directed verdict, and the same rules regarding the sufficiency of the evidence apply. *Henderson v. Traditional Log Homes, Inc.*, 70 N.C. App. 303, 306, 319 S.E.2d 290, 292, *review denied*, 312 N.C. 622, 323 S.E.2d 923 (1984).

At the outset it must be noted that plaintiff had two theories of recovery on his breach of contract claim: constructive eviction and breach of the covenant of quiet enjoyment. Although the trial court instructed the jury on both theories, a single issue was submitted to

the jury which read, "Did the Defendant, Wilmington Mall Realty, breach the lease agreement with the Plaintiff?" On appeal, defendant does not challenge the issue as submitted. Therefore, if there was more than a scintilla of evidence to support *either* constructive eviction *or* breach of the covenant of quiet enjoyment, then the court properly denied defendant's motions for directed verdict and JNOV on the issue of breach of contract.

[1] Constructive eviction is defined as "[a]n act of a landlord which deprives his tenant of that beneficial enjoyment of the premises to which he is entitled under his lease, causing the tenant to abandon them. . . ." *Marina Food Assoc., Inc. v. Marina Restaurant, Inc.*, 100 N.C. App. 82, 92, 394 S.E.2d 824, 830, *review denied*, 327 N.C. 636, 399 S.E.2d 328 (1990). Stated another way, constructive eviction occurs "when a landlord breaches a duty under the lease which renders the premises untenable. . . ." *Id.* As the trial court correctly instructed the jury here, a tenant seeking to establish a claim for constructive eviction has the burden of showing that he abandoned the premises within a reasonable time after the landlord's wrongful act and that the abandonment was proximately caused by the landlord's breach. *Thompson v. Shoemaker*, 7 N.C. App. 687, 690, 173 S.E.2d 627, 630 (1970); *see also* 49 Am. Jur. 2d, *Landlord & Tenant* §§ 644-647 (1995). Defendant argues that plaintiff made neither of these required showings.

Plaintiff first complained of noise in February 1992. Although defendant informed plaintiff in May 1992 that it considered the matter closed, plaintiff continued to lodge complaints with defendant's leasing agent into the fall of 1992 in an effort to resolve the situation. In mid-October plaintiff called a security officer to abate the noise, and six weeks later plaintiff abandoned the property.

Defendant argues that even given the benefit of the time period during which repairs were made, plaintiff's abandonment of the premises some seven to eight months later was not within a reasonable time as a matter of law. While defendant directs us to cases from other jurisdictions which it claims support its position, we are unable to conclude that the time frame for plaintiff's abandonment was unreasonable as a matter of law. What constitutes a reasonable time for abandonment depends on the circumstances of each case and is an issue of fact for the jury. *See Marina Food Assoc.*, 100 N.C. App. at 92-93, 394 S.E.2d at 830 (evidence was sufficient to support constructive eviction claim even though landlord's alleged wrongful acts

McNAMARA v. WILMINGTON MALL REALTY CORP.

[121 N.C. App. 400 (1996)]

occurred prior to March 1985 and tenant did not abandon the premises until January 1986). We find that the above facts, viewed in the light most favorable to plaintiff, constituted sufficient evidence to support a jury finding that plaintiff abandoned the premises within a reasonable time and that the abandonment was the result of defendant's failure to remedy the noise from the studio. Thus, we hold the trial court did not err in denying defendant's motions for directed verdict and JNOV on plaintiff's constructive eviction claim.

The trial court also instructed the jury on breach of the covenant of quiet enjoyment. North Carolina law provides that a lease, in the absence of a provision to the contrary, carries with it an implied covenant that the tenant will have the quiet and peaceable possession of the leased premises during the term of the lease. *Marina Food Assoc.*, 100 N.C. App. at 92, 394 S.E.2d at 830; *Dobbins v. Paul*, 71 N.C. App. 113, 117, 321 S.E.2d 537, 541 (1984) (*citing Produce Co. v. Currin*, 243 N.C. 131, 135, 90 S.E.2d 228, 230 (1955)), *overruled on other grounds, Stanley v. Moore*, 339 N.C. 717, 454 S.E.2d 225 (1995). Our courts have held that where a tenant has been constructively evicted, the covenant of quiet enjoyment has been breached. *Marina Food Assoc.*, 100 N.C. App. at 92, 394 S.E.2d at 830 (*citing Dobbins*, 71 N.C. App. at 117-18, 321 S.E.2d at 541). Since we have determined that plaintiff's evidence established a claim for constructive eviction, it follows that the evidence was also sufficient on plaintiff's claim for breach of the covenant of quiet enjoyment, and the trial court correctly denied defendant's motions for directed verdict and JNOV on that claim.

[2] Defendant attempts to persuade this Court that even if its actions did amount to a constructive eviction or a breach of the covenant of quiet enjoyment, plaintiff's failure to pay rent amounted to a waiver of his right to assert such claims. We note that defendant did not request an instruction that plaintiff's failure to pay rent operated as a waiver; this argument is asserted for the first time in defendant's brief to this Court.

In support of its argument, defendant points to Section 16 of the parties' lease, which reads as follows:

> SECTION 16. QUIET ENJOYMENT. Tenant, upon paying the rent and performing all the other covenants and conditions aforesaid on Tenant's part to be observed and performed under this Lease, shall and may peaceably and quietly have, hold and enjoy the

Demised Premises . . . free from disturbance by Landlord or anyone claiming by, through or under Landlord. . . .

Defendant claims that the terms of this express covenant of quiet enjoyment take precedence over any implied right of quiet enjoyment and that by its language, this provision expressly conditions plaintiff's right to quiet enjoyment upon his payment of the rent.

It is undisputed that plaintiff did not pay rent after April 1992; however, we disagree that this fact operates to bar plaintiff's breach of contract claims. If, as defendant admits, it took no action regarding plaintiff's complaints after April or May 1992, then for purposes of plaintiff's claims, defendant's failure to abate the noise constituted a constructive eviction as of that time. The trial court correctly instructed the jury that plaintiff had a reasonable time within which to abandon the premises, and the jury found that he did so. Therefore, plaintiff's failure to pay rent in the intervening period is not a bar to his breach of contract claims, notwithstanding · the language of Section 16.

## II.

[3] We next address defendant's arguments regarding the issue of damages. At the charge conference, defendant requested a peremptory instruction on damages which was denied. Defendant assigns this denial as error and also argues that its motions for directed verdict and JNOV should have been granted because plaintiff did not meet his burden of proof with respect to damages. In the alternative, defendant seeks a new trial on the issue of damages.

A plaintiff who has been constructively evicted may recover general damages measured by the value, at the time of eviction, of the unexpired term of the lease, less any rent reserved. *Marina Food Assoc.*, 100 N.C. App. at 93, 394 S.E.2d at 831. Plaintiff presented no evidence of the value of the remainder of the lease, confining his proof of damages solely to the issue of lost future profits. "Damages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach." *Mosley & Mosley Builders v. Landin Ltd.*, 87 N.C. App. 438, 446, 361 S.E.2d 608, 613 (1987) (*citing Perkins v. Langdon*, 237 N.C. 159, 170, 74 S.E.2d 634, 643 (1953)), *cert. dismissed*, 322 N.C. 607, 370 S.E.2d 416 (1988). To recover lost profits, the claimant must prove such losses with "reasonable certainty." *Olivetti Corp. v. Ames Business Systems, Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585, reh'g *denied*, 320 N.C. 639, 360 S.E.2d 92 (1987). Although absolute certainty is not required, damages for lost profits will not be awarded based on hypothetical or

speculative forecasts. *Mosley*, 87 N.C. App. at 446, 361 S.E.2d at 613 (when prospective profits are conjectural, remote, or speculative, they are not recoverable); *see also Weyerhaeuser Co. v. Supply Co.*, 292 N.C. 557, 561, 234 S.E.2d 605, 607 (1977).

In *Olivetti*, our Supreme Court recognized that "lost future profits are difficult for a new business to calculate and prove. . . ." *Olivetti*, 319 N.C. at 546, 356 S.E.2d at 585. However, the Court refused to adopt a *per se* "New Business Rule" that would preclude an award of damages for lost profits where the allegedly damaged party has no recent record of profitability, holding instead that such businesses, like established businesses, must prove lost profits with reasonable certainty. *Id.* at 545-46, 356 S.E.2d at 585. The Court stated that the burden of proving such damages is on the party seeking them, and as part of this burden, that party must show "that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Id.* at 547-48, 356 S.E.2d at 586.

Plaintiff here did not have an established history of profits. His evidence of lost profits consisted entirely of the testimony of Dr. Craig Galbraith, a professor of management at the University of North Carolina at Wilmington and a specialist in "entrepreneurship." Dr. Galbraith prepared two reports in connection with his calculation of plaintiff's lost profits. The first report, which Dr. Galbraith characterized as a "preliminary report," was dated 9 February 1993 and projected a loss of $15,200. Six days later, after meeting with plaintiff and his attorney to go over the "preliminary report," Dr. Galbraith prepared a second report which projected losses of $124,000 ($17,300 in lost earnings from 17 February 1992 to 24 December 1992, $97,000 in lost fair market value, and $9,000 in lost personal wages). Defendant argues that Dr. Galbraith's calculations are "inherently speculative or otherwise flawed" and that plaintiff has failed to prove lost profits with the requisite degree of certainty.

Defendant first claims Dr. Galbraith's testimony failed to establish a causal connection between the noise from the studio and the lost profits sought by plaintiff. We have carefully examined the record, including Dr. Galbraith's testimony, and we find that the evidence of such a connection, while not overwhelming, was sufficient to withstand a motion for directed verdict. The trial court properly instructed the jury that in order to recover lost profits, plaintiff had to prove that *except for defendant's breach of the lease agreement,* such

profits would have been realized. We cannot conclude that plaintiff's lost profits claim fails for lack of proximate cause.

However, we agree with defendant that Dr. Galbraith's calculations were not based upon standards that allowed the jury to determine the amount of plaintiff's lost profits with reasonable certainty. *See Olivetti*, 319 N.C. at 547-48, 356 S.E.2d at 586. We have carefully examined Dr. Galbraith's testimony, and we find it is deficient in a number of respects. First, Dr. Galbraith based his estimate of plaintiff's lost profits on the assumption that from January 1992 through the remaining term of the lease, plaintiff's sales would have risen in a linear fashion to the point where they matched the average sales of independent national jewelers. There was no evidence presented to support such an assumption.

Second, Dr. Galbraith made virtually no effort to obtain sales figures and other financial data from small custom jewelry stores like plaintiff's or from other jewelers in the Wilmington area. Rather, he relied exclusively on data from independent national jewelers without ascertaining whether these jewelers bore any similarity to plaintiff's business. We hold that under the circumstances of this case, Dr. Galbraith's reliance on this data rendered his calculations too conjectural to support an award of lost profits.

In *Iron Steamer, Ltd. v. Trinity Restaurant*, 110 N.C. App. 843, 431 S.E.2d 767 (1993), the defendant lessee sought lost profits resulting from the plaintiff lessor's alleged breach of lease. The lessee opened a resort restaurant in April 1989 and ceased operations in November 1989. The lessee's gross revenues for August through November were lower than the revenues for May through July. The trial court found that but for the lessor's breach of contract, " 'the gross sales figures for a restaurant of that type and location, for the month of August, should have been similar to the gross sales figures for the month of July.' " The court further found that since September, October, and November are good fishing months, the restaurant's revenues " 'should have been similar to, or better than, the gross sales figures for the months of May or June.' " *Iron Steamer*, 110 N.C. App. at 848, 431 S.E.2d at 771. The court based its findings solely on the testimony of Mr. Cantor, one of the defendants, who assumed that August would have been a more profitable month than July and based his calculations of lost profits for August through November on this assumption. *Id.* at 848-49, 431 S.E.2d at 771. Mr. Cantor's bases for estimating the lost profits at this restaurant were his brief experience

at a restaurant in another city and his experience as a cook at a nearby hotel. *Id.* at 849, 431 S.E.2d at 771. This Court reversed the award of lost profits to the lessee, stating that "Mr. Cantor's estimation of lost profits is based on assumptions that are purely speculative in nature." *Id.* Likewise, we find that Dr. Galbraith's assumption that plaintiff's sales would rise to meet the average sales of independent national jewelers is conjectural and speculative and cannot support the award of lost profits in this case. *See also Weyerhaeuser*, 292 N.C. at 560, 234 S.E.2d at 607 (where plaintiff's business suffered a net loss in its first year, evidence that the budget had projected a profit of $80,000 for that year provided no basis for an award of lost profits since any estimate of plaintiff's expected profits was based solely on speculation); *McBride v. Camping Center*, 36 N.C. App. 370, 372, 243 S.E.2d 913, 915 (where any estimate of plaintiff's expected profits was, on the evidence presented, based solely on speculation, there was no basis for an award of lost profits), *review denied*, 295 N.C. 550, 248 S.E.2d 727 (1978).

The *Iron Steamer* court concluded its opinion by emphasizing that the lessee's business was an unestablished resort restaurant. In that context, the Court noted that

> the relationship between lost profits and the income needed to generate such lost profits is peculiarly sensitive to certain variables including the quality of food, quality of service, and the seasonal nature of the business. Therefore, proof of lost profits with *reasonable certainty* under these circumstances requires more specific evidence and thus a higher burden of proof. While difficult to determine, "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analysis, and business records of similar enterprises."

*Iron Steamer*, 110 N.C. App. at 849, 431 S.E.2d at 771 (emphasis in original) (*quoting* 22 Am. Jur. 2d *Damages* § 627 (1988)). In the instant case, as in *Iron Steamer*, plaintiff's business was unestablished (it was only five months old when the aerobics studio moved in and the alleged breach occurred) and, by Dr. Galbraith's own testimony, was "peculiarly sensitive to certain variables" such as the quality of plaintiff's custom jewelry work, the extent of plaintiff's advertising and marketing efforts, and the seasonal nature of the jewelry business. Thus, plaintiff was required to come forward with more spe-

cific evidence to support his claim for lost profits. As the *Iron Steamer* court recognized, sales figures from businesses which are similar in size, location, and type of product sold are an important source of such specific evidence; however, Dr. Galbraith failed to obtain such figures and to include them in his calculations.

Plaintiff relies on *Mosley & Mosley Builders v. Landin Ltd.*, 87 N.C. App. 438, 361 S.E.2d 608 (1987), in support of his claim that Dr. Galbraith's method of calculating lost profits was reasonably certain. In *Mosley*, a retail store selling nuts was wrongfully evicted from a shopping mall two years after it moved into the mall. Upon relocation, the store failed to turn a profit. *Id.* at 440, 361 S.E.2d at 609-10. In support of its claim for lost profits against the landlord, the store relied on evidence of the sales of its successor tenant at the mall, a national franchise which sold products similar to those sold by the plaintiff's store. *Id.* at 445, 361 S.E.2d at 613. The defendant challenged the admission of this evidence, claiming that differences in marketing and management practices of the two stores rendered the evidence unreasonably speculative. *Id.* at 446, 361 S.E.2d at 613. This Court accepted the evidence, noting that differences in marketing and management practices of the two stores went only to the weight and not the admissibility of the evidence. *Id.* Plaintiff argues that under *Mosley*, any differences between plaintiff's business and the independent national jewelers upon whose sales data Dr. Galbraith relied should not render his testimony speculative and therefore inadmissible.

We find that *Mosley* is distinguishable from the instant case and, in fact, supports our conclusion here. In *Mosley*, the plaintiff's store was profitable at the time of the eviction and had successfully conducted its business for such length of time that its profits were reasonably ascertainable. *Id.* Furthermore, the successor store sold similar merchandise in the same location as plaintiff's store, and its sales figures were therefore relevant to show what sales the plaintiff's store might have expected in the future had it not been evicted. *Id.* Thus, in *Mosley* the expert was drawing comparisons between an established store with a history of profits, and a similar store at the same location. Here, by contrast, plaintiff's store had no history of profits, and Dr. Galbraith drew comparisons to much larger stores in different locations selling products other than custom jewelry.

Also, at the time plaintiff opened his store at the Mall, he had virtually no experience owning and operating a jewelry store. Dr.

Galbraith acknowledged that start-up businesses such as plaintiff's have "relatively high failure rates." However, he stated that he did not consider this factor relevant in calculating plaintiff's lost profits. With regard to his prior experience in the jewelry business, plaintiff testified that he worked at a custom design jewelry store in Wilmington for two years (1986 and 1987) and then in sales and management at a large chain jewelry store in Allentown, Pennsylvania, for a year. He also testified that he worked for Atlantis Gold Crafters in Wilmington from fall 1990 until early spring 1991, where his activities were limited to "making the jewelry and doing some repair" for about four hours a day. He stated he had no ownership interest in Atlantis and considered his work there a "hobby." Thus, plaintiff's own testimony established that plaintiff had no prior experience owning or operating a custom jewelry business. Dr. Galbraith, however, failed to consider this inexperience in his analysis. We believe that the owner's prior business experience (or lack thereof) could be a relevant factor in assessing the future profitability of a new business.

In sum, we hold that plaintiff failed to meet his burden of proving lost profits with reasonable certainty. We therefore vacate the portion of the trial court's judgment awarding plaintiff $110,000 in damages, and we remand this cause to the trial court for a new trial on the issue of damages. *See McBride*, 36 N.C. App. at 373, 243 S.E.2d at 915 (this Court has discretionary authority to award partial new trial on issue of damages where it is clear that error in assessing damages did not affect determination of issue of liability). In light of this decision, we decline to address defendant's remaining assignments on the issue of damages.

III.

[4] Finally, defendant argues that the trial court erred in its decisions on two evidentiary matters. We disagree.

Plaintiff attempted to prove at trial that defendant breached its lease with plaintiff by allowing tenants other than retail establishments to locate in the Mall and by failing to attract other retail stores to the Mall. Over defendant's objection, plaintiff was allowed to introduce evidence of statements made during the course of lease negotiations regarding the Mall's desire to attract other retail tenants. The evidence was admitted under the holding of *IRT Property Co. v. Papagayo, Inc.*, 112 N.C. App. 318, 435 S.E.2d 565 (1993), *reversed*, 338 N.C. 293, 449 S.E.2d 459 (1994), in which this Court held that the

use of the words "shopping center," "mall," and "galleria" in a commercial lease could be interpreted as requiring the shopping center to rent only to retail stores and that evidence of representations made prior to the execution of the lease could be admitted to explain the ambiguous terms of the lease. *Id.* at 324-26, 435 S.E.2d at 568-69. However, following the trial of the instant case, our Supreme Court reversed this Court's decision in *Papagayo*, holding that terms such as "shopping center" and "mall" in the lease agreement did not create an ambiguity and the parol evidence rule therefore prevented evidence of prior negotiations from coming in to contradict the terms of the lease. *IRT Property Co. v. Papagayo, Inc.*, 338 N.C. 293, 296-97, 449 S.E.2d 459, 461 (1994).

Here, plaintiff offered the evidence of prior negotiations for two purposes: to prove breach of the lease and to prove fraud and unfair and deceptive trade practices. Although the *Papagayo* case prevented the evidence from coming in to prove breach of the lease, the evidence was properly admitted to prove fraud and unfair and deceptive trade practices. *See Parker v. Bennett*, 32 N.C. App. 46, 50-51, 231 S.E.2d 10, 13 (citation omitted) (" 'Parol evidence is admissible to show that a written contract was procured by fraud, for the allegations of fraud challenge the validity of the contract itself, not the accuracy of its terms. . . .' "), *review denied*, 292 N.C. 266, 233 S.E.2d 393 (1977); *Love v. Keith*, 95 N.C. App. 549, 553, 383 S.E.2d 674, 677 (1989) (parol evidence admissible to show unfair and deceptive trade practices), *overruled in part on other grounds, Custom Molders, Inc. v. American Yard Products, Inc.*, 342 N.C. 133, 463 S.E.2d 199 (1995). Thus, the trial court did not err in admitting this evidence.

Plaintiff also offered evidence of numerous complaints lodged against defendant by other tenants of the Mall. This evidence was introduced to support plaintiff's claims for fraud and unfair and deceptive trade practices on the theory that defendant had an affirmative duty to disclose these complaints during the lease negotiations. Defendant argued that this testimony was irrelevant and unfairly prejudicial, but the court, after hearing the arguments of both parties, admitted the evidence. The trial court ultimately granted defendant's motion for a directed verdict on these claims. Defendant now contends the admission of this evidence was improper. The decision whether to exclude evidence due to the potential for unfair prejudice, confusion, or misleading the jury is within the sound discretion of the trial court and will not be disturbed absent a showing that the ruling was so arbitrary it could not have been the result of a reasoned

decision. *Smith v. Pass*, 95 N.C. App. 243, 250, 382 S.E.2d 781, 786 (1989); *see also* N.C. Gen. Stat. § 8C-1, Rule 403 (1992). Defendant has not shown that the trial court abused its discretion in admitting the contested evidence or that defendant was prejudiced by its admission.

In a cross-assignment of error, plaintiff argues that the trial court erred in dismissing his claims for fraud and unfair and deceptive trade practices. We note that plaintiff's argument should have been presented as a cross-appeal rather than a cross-assignment of error. *See U v. Duke University*, 91 N.C. App. 171, 185, 371 S.E.2d 701, 710, *review denied*, 323 N.C. 629, 374 S.E.2d 590 (1988) (directed verdict on abuse of process and malicious prosecution claims could only be challenged by cross appeal, not cross-assignments); *Cherry, Bekaert & Holland v. Worsham*, 81 N.C. App. 116, 118, 344 S.E.2d 97, 99 (1986) (dismissal of unfair and deceptive trade practices claim, injunctive relief, and claim for specific performance could only be challenged by cross-appeal). Nevertheless, we have carefully reviewed plaintiff's argument, and we conclude the trial court did not err in dismissing those claims.

Affirmed in part, vacated in part, and remanded for a new trial on the issue of damages.

Judges JOHNSON and SMITH concur.