CALABRIA, Judge.
Johnson Breeders, Inc. ("Johnson") appeals from the trial court's denial of its motions for directed verdict and judgment notwithstanding the verdict ("JNOV"), and from the judgment entered upon the jury's verdict on breach, repudiation, and damages in relation to Johnson's chicken harvesting contract with John E. Brock ("plaintiff"). We hold that the trial court properly denied Johnson's motions and did not err by entering judgment upon the verdict.
I. Background
Plaintiff, a chicken grower, harvested chickens for Johnson pursuant to a series of written contracts prepared by Johnson from 1987 until 2011. Plaintiff originally built his chicken houses according to the specifications required by defendant in 1987. Over the years, Johnson furnished flocks of baby chicks ("flocks" or "chickens") to plaintiff, who then provided services-including labor, electricity, houses, and equipment-for raising chickens to maturity in five to six weeks. Johnson would then pick up the mature birds and pay plaintiff for such services based on the weight of chickens harvested. In addition to its payments to plaintiff, Johnson included an accounting for plaintiff's feed and utility usage along with a ranking of plaintiff's performance in relation to other growers. After Johnson retrieved the mature chickens, plaintiff would prepare his chicken houses for the next flock.
Plaintiff and Johnson entered into their most recent contract on 30 June 2010 ("the contract"). According to paragraph six of the contract, the "number and breed of [chickens]" to be supplied to plaintiff were "to be determined by J [ohnson] in its sole discretion." The contract further provided that Johnson could terminate its agreement with plaintiff for any reason, with or without cause, provided that Johnson supplied him with at least ninety days' written notice, including the date the termination became effective and the reasons for termination.
In 2011, Johnson decided to require its growers to upgrade their facilities to meet certain radiant heat, tunnel ventilation, and other standards. As a result, Johnson sent two written notices to its growers, which described the new requirements and asked the growers to indicate whether they planned to comply with the upgrade request. Johnson purportedly sent both notices to plaintiff, but it is not clear from the record if he received them. Johnson's last order for raising chickens was placed with plaintiff on 26 August 2011, and that flock was harvested on 29 September 2011. Plaintiff prepared to receive the next flock, but no chickens were delivered. As a result, plaintiff contacted Johnson to inquire about the missing flock. At that point, defendant's employees explained to plaintiff that no more flocks would be delivered. Johnson representative Greg Raynor ("Raynor") refused to supply more chickens to plaintiff, stating that plaintiff's facilities were currently outdated. In Johnson's view, plaintiff's inadequate heat and ventilation systems caused chicken mortality rates to be unacceptably high in the winter. Although Johnson never formally terminated the agreement, plaintiff's growing contract was placed on its "inactive" list.
Plaintiff filed a complaint against Johnson on 10 October 2012, alleging that Johnson breached the contract by informing plaintiff that it had no intention of honoring its contractual obligations and refusing to provide additional chickens or supplies to plaintiff. On 1 February 2013, Johnson moved for summary judgment, contending that there were no material issues of fact and that it was entitled to judgment as a matter of law in its favor on all claims. The trial court denied Johnson's motion on 22 April 2013, and the parties proceeded to trial.
On 4 March 2014, Johnson moved for a directed verdict at the close of plaintiff's evidence and the motion was denied. Johnson renewed the motion for a directed verdict at the close of all the evidence, but once again, the trial court denied it. The jury returned a verdict in favor of plaintiff on 17 March 2014, concluding that Johnson had breached the contract by non-performance, that plaintiff did not breach the contract by repudiation, and that plaintiff was entitled to recover $42,235.96 from Johnson. Immediately after the jury verdict, Johnson made a motion for JNOV, which was again denied. The trial court entered final judgment on the verdict on 20 March 2014. On 16 April 2014, Johnson filed notice of appeal for the 22 April 2013 order denying its motion for summary judgment, the 3 March 2014 denial of its motion for directed verdict, and the trial court's final judgment entered on 20 March 2014.
II. Appellate Rules Violations
As an initial matter, we note that Johnson has violated two provisions of the North Carolina Rules of Appellate Procedure. In Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.,362 N.C. 191, 657 S.E.2d 361 (2008), our Supreme Court provided detailed instructions regarding appellate rules violations. The DogwoodCourt recognized that rules violations typically fall under three main categories: (1) waiver occurring at trial; (2) defects in appellate jurisdiction; and (3) nonjurisdictional defects. Id.at 194, 657 S.E.2d at 363. The instant case involves nonjurisdictional defects. Here, in its brief, Johnson failed to provide statements of the grounds for appellate review and the applicable standards of review.
Because nonjurisdictional rules are "designed primarily to keep the appellate process flowing in an orderly manner[,] ... a party's failure to comply with [them] normally should not lead to dismissal of the appeal." Id.at 198, 657 S.E.2d at 365 (quotation marks omitted). Then again, where nonjurisdictional rule requirements are "gross" or "substantial," our appellate courts may impose appropriate sanctions under Rules 25 and 34. Id.at 199, 657 S.E.2d at 366 ; see alsoN.C.R.App. P. 25(b) (2015) (authorizing sanctions when the Court determines that a party or attorney "substantially failed to comply with [the] appellate rules"); N.C.R.App. P. 34 (2015) (authorizing dismissal of the appeal, monetary damages, and any other sanction deemed just and proper where a brief or other document filed with the Court "grossly violated appellate court rules"). "In evaluating whether appellate rules violations are 'substantial' or 'gross' we may consider whether and to what extent the noncompliance impairs our task of review and whether and to what extent review on the merits would frustrate the adversarial process."Tabor v. Kaufman,196 N.C.App. 745, 747, 675 S.E.2d 701, 703 (2009) (citation and internal quotation marks omitted).
Johnson violated N.C.R.App. P. 28(b)(4) by failing to provide a statement of grounds for appellate review. Johnson also violated N.C.R.App. P. 28(b)(6) by failing to provide a concise statement of the applicable standards of review for any of the three issues raised in its argument. Despite these rule violations, Johnson's brief contains a sufficient presentation of the issues such that we may conduct a meaningful review of them. Given our strong preference to decide cases on the merits, see Dogwood,362 N.C. at 199, 657 S.E.2d 366-67, and acknowledging that the "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them [,]" id.at 194, 657 S.E.2d at 363 (citation omitted; first alteration in original), we choose not to impose sanctions on Johnson and decline to dismiss its appeal.
III. Orders and Judgments Appealed
In order to properly review the issues raised in Johnson's appeal, we must first determine which orders and judgments are being appealed. Johnson's notice of appeal purported to appeal from the order denying Johnson's motion for summary judgment, the denial of its motion for directed verdict, and the final judgment entered upon the jury's verdict. However, Johnson's brief fails to either specify the grounds for its appeal or clearly state which rulings and orders it is challenging.
We first note that, even if we found that Johnson had timely filed its notice of appeal from the denial of its 2013 summary judgment motion, the order is no longer reviewable. Our Supreme Court has explained that "[t]he purpose of summary judgment is to bring litigation to an early decision on the merits without the delay and expense of a trial when no material facts are at issue." Harris v. Walden,314 N.C. 284, 286, 333 S.E.2d 254, 256 (1985). This purpose cannot be served after a case has proceeded to trial and been determined on the merits by the judge or jury. Id.
To grant a review of the denial of the summary judgment motion after a final judgment on the merits, however, would mean that a party who prevailed at trial after a complete presentation of evidence by both sides with cross-examination could be deprived of a favorable verdict. This would allow a verdict reached after the presentation of all the evidence to be overcome by a limited forecast of the evidence. In order to avoid such an anomalous result, we hold that the denial of a motion for summary judgment is not reviewable during appeal from a final judgment rendered in a trial on the merits.
Id.Accordingly, we decline to review the denial of Johnson's summary judgment motion.
Furthermore, in its brief, Johnson raises the following issues:
(1) Did Johnson Breeders breach the Broiler Growing Contract of 30 June 2010[ ];
(2) If so, did John Brock repudiate the growing contract dated 30 June 2010 by failing to make upgrades to his chicken houses[ ]; and
(3) If not, and there was a breach of contract, were the damages calculated correctly?
As plaintiff correctly points out, issues one and two "are merely restatements of the first two issues submitted to the jury." Even so, Johnson's arguments on the first two issues presented make it reasonably clear that Johnson is challenging the trial court's rulings on its motions for directed verdict and JNOV. As for Johnson's third issue, we simply review it as a challenge to the trial court's entry of judgment upon the jury's damages award.
IV. Analysis
A. Breach of Contract and Repudiation
We begin by addressing Johnson's arguments that the trial court erred by denying its motions for directed verdict at the close of the evidence and for JNOV.
This Court's review of a motion for a directed verdict is essentially the same as one for [JNOV]. Both motions test the sufficiency of the evidence presented at trial, the first after the plaintiff's case in chief, and the latter after the jury's decision. Additionally, both motions may be granted if the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn and if the credibility of the movant's evidence is manifest as a matter of law. In assessing the propriety of both motions, we must take the plaintiff's evidence as true, and view all of the evidence in the light most favorable to him/her, giving him/her the benefit of every reasonable inference which may be legitimately drawn therefrom, with conflicts, contradictions, and inconsistencies being resolved in the plaintiff's favor.
Watson v. Dixon,130 N.C.App. 47, 51-52, 502 S.E.2d 15, 19 (1998) (quotation marks and citations omitted).
1. Breach
Johnson argues that it did not breach the contract with plaintiff. In essence, Johnson contends that the contract's terms gave it unfettered discretion to refuse to provide any chickens to plaintiff.
In North Carolina, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Branch v. High Rock Lake Realty, Inc.,151 N.C.App. 244, 250, 565 S.E.2d 248, 252 (2002) (citation omitted). As discussed below, a valid contract existed between Johnson and plaintiff. Therefore, the issue before the jury was whether Johnson breached the terms of its contract with plaintiff.
Paragraphs three and six of the contract bear directly on this issue and provide, in pertinent part, as follows:
3. MATERIAL RISKS ...
(v) JOHNSON makes no representation, warranty, or guarantee as to the number or breed of birds to be placed with [plaintiff] under this Contract....
6. OBLIGATIONS OF JOHNSON ...
A. JOHNSON agrees to deliver the FLOCKS (number and breed of which are to be determined by JOHNSON in its sole discretion) to [plaintiff].
According to Johnson, "there was never an offer or acceptance over an exact number of birds, or any number of birds, or the timing of delivery of birds, to be delivered." Thus, Johnson argues, the contract "merely governs the parties' relationship during and immediately after (and if) a flock is placed with ... [p]laintiff."
Our review of the contract reveals that Johnson and plaintiff's arrangement was clear-Johnson agreed to deliver chickens, but retained total discretion as to how many and what kind were placed in plaintiff's care during any given growing period. Absent from the agreement is language reserving Johnson's purported right to refuse to deliver anybirds in perpetuity. As the trial court noted before denying Johnson's motion for directed verdict, "why would you put in there 'JOHNSON agrees to deliver the FLOCKS' had it been optional as to whether [Johnson] delivered any birds?" Furthermore, if we adopted Johnson's proposed construction of the contract, it would render paragraphs eight and nine-which give Johnson, respectively, the rights to terminate the contract for cause or without cause upon ninety days' written notice-meaningless. Indeed, the contract's principal purpose was for Johnson "to place with [plaintiff] flocks of its baby chicks ... for [plaintiff] to manage and raise on [plaintiff's] property ... until any and all [flocks were] marketable as broilers," and the parties' course of conduct over their twenty-four-year relationship bore that out. The language in paragraphs three and six of the contract, therefore, cannot be fairly read to grant Johnson a unilateral right to refuse further deliveries of chickens without consequence. Accordingly, when Johnson decided to stop delivering chickens to plaintiff, it breached the terms of the contract.
Nevertheless, Johnson argues that plaintiff's breach of contract claim is barred by Gregory v. Perdue, Inc.,47 N.C.App. 655, 267 S.E.2d 584 (1980), where this Court held that the plaintiff had
at most alleged an agreement by him to grow an unspecified quantity of chickens for defendant in the future under certain quality conditions in return for which defendant agreed to guarantee plaintiff a stated minimum profit and to aid him in remodeling his chicken houses. Consequently, the acceptance of a proposition to make a contract, the terms of which are to be subsequently fixed, does not constitute a binding obligation. An offer to enter into a contract in the future must, to be binding, specify all of the essential and material terms and leave nothing to be agreed upon as a result of future negotiations. To constitute a valid contract, the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.
47 N.C.App. at 657, 267 S.E.2d at 586 (citations omitted). As demonstrated by the language quoted above, the dispositive issue in Gregorywas contract formation.In the instant case, the trial court focused on contract interpretation, and formation was not at issue. Significantly, Raynor acknowledged that Johnson had a contract with plaintiff and that he had signed it. Furthermore, after the parties formed a business relationship in 1987, plaintiff consistently raised chickens for Johnson until September of 2011. As a result, we find that Gregoryis inapplicable to this case-Johnson agreed to deliver chickens; it did not agree to make a contract to deliver chickens in the future.
Johnson also claims that plaintiff's theory at trial appeared to be that "Johnson failed to give ninety ... days' notice before it terminated the [c]ontract." According to Johnson, plaintiff's argument should have failed for two reasons: (1) Johnson never tendered "written" notice of termination and (2) plaintiff admitted several times that the contract "had not been cancelled or terminated."
We need say little more than Johnson's argument is without merit. If Johnson desired relief from its promise to perform under its contract with plaintiff, it should have properly terminated the agreement pursuant to either paragraph eight or nine and tendered ninety days' written notice, the very thing Johnson admits that it did notdo. Instead, the parties' contractual obligations remained in place and, as mentioned above, Johnson's refusal to deliver chickens to plaintiff constituted a breach of the contract.
Viewing the evidence in the light most favorable to plaintiff, and taking that evidence as true, the facts in this case were sufficient to establish that Johnson breached its contract with plaintiff. Therefore, we conclude that the trial court properly denied Johnson's motions for a directed verdict and JNOV as to the breach issue.
2. Repudiation
Johnson next argues that it "was not required to provide the requisite notice [of termination] since its performance under the [c]ontract was discharged given [p]laintiff's repudiation of his obligations under the [c]ontract in refusing to make capital improvements." According to Johnson, because "there is no dispute that [p]laintiff failed to make the necessary upgrades to his facility," Johnson was discharged from any duties it had under the contract.
Breach of contract "may ... occur by repudiation." Millis Const. Co. v. Fairfield Sapphire Valley, Inc.,86 N.C.App. 506, 510, 358 S.E.2d 566, 569 (1987). Repudiation is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties. Id.When a contractually bound party expresses, by words or conduct, a "positive, distinct, unequivocal and absolute refusal to perform[,]" he repudiates his obligation under the contract. Messer v. Laurel Hill Assocs.,93 N.C.App. 439, 443, 378 S.E.2d 220, 223 (1989) (quoting Edwards v. Proctor,173 N.C. 41, 91 S.E. 584, 585 (1917) ).
Paragraph two of the contract provides as follows:
2. ADDITIONAL CAPITAL INVESTMENTS DISCLOSURE STATEMENT.ADDITIONAL LARGE CAPITAL INVESTMENTS MAY BE REQUIRED OF GROWER DURING THE TERM OF THIS CONTRACT.
On 12 June 2011, Johnson sent a notice to all of its growers stating that upgrades (i.e., capital investments) to their chicken house ventilation, radiant heat, and other systems would be required. Growers who did not intend to make such upgrades were asked to advise Johnson in writing. Johnson sent a second notice entitled "Housing Standards Update" and asked all growers to indicate whether they planned to meet its new requirements. At trial, Johnson elicited testimony that plaintiff failed to respond to either notice, but the evidence is conflicting as to whether plaintiff received Johnson's upgrade requests. Johnson also presented testimony that the first upgrade notice was hand-delivered to plaintiff. However, plaintiff claimed that he received neither the first nor the second notice, and in rebuttal, plaintiff called another grower to testify that he also had not received the notices.
Once Johnson stopped sending him chickens, plaintiff made affirmative efforts to find out the reason. Raynor indicated that Johnson would no longer place chickens with plaintiff because he refused to upgrade his houses, but plaintiff stated that this was "the first [he] had heard of it." Apparently, plaintiff contacted two other Johnson officials, but one simply deferred to what "[Raynor] said" and the other never returned plaintiff's calls. Plaintiff's actions did not indicate a "positive, distinct, unequivocal and absolute refusal to perform" his contractual duties. Messer,93 N.C.App. at 443, 378 S.E.2d at 223. Thus, even assuming that plaintiff was obligated to make the capital investments that Johnson required, the evidence was conflicting as to whether he actually received notice of these requirements before Johnson refused to send him any more chickens, thereby breaching the parties' agreement. When viewed in the light most favorable to plaintiff, there was sufficient evidence for the jury to conclude that plaintiff never received such notice. We cannot say that plaintiff made any kind of positive statement indicating he would not or could not substantially perform his contractual duties before Johnson was in breach. In fact, the evidence points the other way. Consequently, the trial court properly denied Johnson's motions for directed verdict and JNOV on this issue.
B. Damages
In its final argument, Johnson insists that the damages awarded to plaintiff were speculative. This is so, according to Johnson, because the jury "was allowed to ... assume ... that plaintiff would have had two more flocks delivered" and to "select[ ] the highest payment plaintiff ... received from [Johnson] in 2011, not the most recent payment."
A party claiming damages from a breach of contract must prove its losses with "reasonable certainty." Matthews v. Davis,191 N.C.App. 545, 551, 664 S.E.2d 16, 20 (2008) (citing Olivetti Corp. v. Ames Bus. Sys., Inc.,319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987) ). "While the reasonable certainty standard requires something more than 'hypothetical or speculative forecasts,' it does not require absolute certainty." Id.at 551, 664 S.E.2d at 21 (quoting McNamara v. Wilmington Mall Realty Corp.,121 N.C.App. 400, 407-08, 466 S.E.2d 324, 329 (1996) ). "[D]amages for lost profits will not be awarded based on hypothetical or speculative forecasts." McNamara,121 N.C.App. at 407-08, 466 S.E.2d at 329. As a general matter, the amount of damages is a question of fact, but whether that amount has been proven with reasonable certainty is a question of law, and we review it de novo. See Matthews,191 N.C.App. at 551, 664 S.E.2d at 21 (citing Olivetti,319 N.C. at 548, 356 S.E.2d at 586-87 ).
Here, plaintiff testified that Johnson typically placed birds with him every five to six weeks. In addition, plaintiff produced an accounting which showed that he raised five flocks for Johnson during 2011 and that he was paid an average of $14,549.00 for each one. Plaintiff's highest payout in 2011 was $21,117.98, while his lowest payout was $10,158.11. The jury awarded plaintiff $42,235.96, twice the amount of his highest 2011 payout. Although the record is not clear, it appears the jury anticipated that even if Johnson had given ninety days' written notice and properly terminated the contract instead of breaching it, plaintiff would have received at least two more flocks during the termination period. This approach to calculating damages was not too remote or conjectural.
Plaintiff's testimony established that he was ready, willing, and able to receive and raise more flocks. Significantly, plaintiff was Johnson's top-rated grower shortly before it refused to deliver more flocks to him. Plaintiff also testified that his rating remained above average throughout 2011. Proof that plaintiff was in the upper echelon of growers before Johnson's breach, and that he was ready to raise additional flocks, was sufficient to show that he would have realized profits if more chickens had been delivered. As noted above, Johnson retained sole discretion over the size of the flocks that were delivered to plaintiff. In the absence of an agreement as to the quantity of chickens to be delivered at any one time, plaintiff's profits from raising them naturally fluctuated. Thus, plaintiff could only give an approximation of his losses. That the jury award was based on plaintiff's best growing performance during 2011 does not make the amount of damages inherently speculative. After reviewing all of the testimonial and documentary evidence that plaintiff presented on this issue, we conclude that the damages award "may fairly be supposed to have been in the contemplation of the parties, when they made the contract, and naturally resulted from its breach[,]"Bryant v. S. Box & Lumber Co.,192 N.C. 607, 611, 135 S.E. 531, 532 (1926), and that the jury's calculations were not based on impermissible speculation.
V. Conclusion
Although we reached the merits of this appeal, we must express our concern about Johnson's briefing of this appeal. In addition to its violations of the relevant Rules of Appellate Procedure, Johnson enunciated the errors it assigned to the trial court's orders and judgment in a confusing way. Johnson's arguments are coherent, but its presentation of the issues has made our review of Johnson's challenges to the trial court's rulings and the jury's verdict unnecessarily difficult. We fully recognize that the practice of law is a busy, stressful, deadline-driven endeavor, and that to err is human. Even so, when our time is consumed helping parties construct their appeals, we are taken away from facilitating open access to the equal administration of justice in our courts, and that is unacceptable.
Because plaintiff made no positive and unequivocal statement that he would not perform under the contract, he did not repudiate it. The contract did not afford Johnson the right to refuse to deliver chickens to plaintiff unless it properly terminated the agreement. Because a proper termination was never achieved, Johnson breached the contract when it refused to deliver additional chickens to plaintiff. In addition, the jury's damages award was not speculative. Accordingly, the trial court did not err in denying Johnson's motions for directed verdict and JNOV or in entering judgment upon the jury's verdict.
Affirmed.
Chief Judge McGEE and Judge McCULLOUGH concur.
Report per Rule 30(e).
Opinion
Appeal by defendant from orally rendered orders at trial, and from judgment entered 20 March 2014, by Judge W. Douglas Parsons in Duplin County Superior Court. Heard in the Court of Appeals 5 January 2015.